**SACK & SACK, LLP**
**Attorneys for Plaintiff**
70 East 55th Street, 10th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

**KAREN AFLALO**,
                                            :
                                            :          **16-cv-_____**
                        Plaintiff,          :
                                            :          **COMPLAINT**
            vs.                             :
                                            :          **JURY TRIAL REQUESTED**
**CANTOR FITZGERALD, L.P., CANTOR**         :
**FITZGERALD SECURITIES, INC., BGC**        :
**PARTNERS, INC., GFInet, INC. and GFI**    :
**GROUP, INC.,**                            :
                                            :
                        Defendants.         :
------------------------------------------------------------X

        Plaintiff, Karen Aflalo ("*Aflalo*" or "*Plaintiff*"), by her attorneys, Sack & Sack, LLP, as

and for her Complaint against Cantor Fitzgerald, LP ("*Cantor Fitzgerald Partnership*"), Cantor

Fitzgerald Securities, Inc. ("*Cantor Fitzgerald Securities*"), BGC Partners, Inc. ("*BGC*"),

GFInet, Inc. ("*GFInet*") and GFI Group, Inc. ("*GFI*") (collectively, "*Cantor*" or "*Defendants*"*)*,

alleges as follows:

## NATURE OF THE ACTION

        1.      Plaintiff brings this action against her former employer seeking damages resulting

from retaliation she suffered at the hands of Defendants in respect of the terms, conditions, and

privileges of her employment in violation of the anti-retaliation, whistleblower protection,

statutes of the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) ("*FLSA*"), and the New York

Labor Law § 215(a) ("*NYLL*").

2.      Specifically, Plaintiff alleges that Cantor retaliated against her following, and in response to, several sufficiently clear and specific internal complaints made by Plaintiff to her employer such that her employer, Cantor, reasonably understood that Plaintiff was asserting the FLSA and NYLL rights of Cantor employees.   Such complaints by Plaintiff are protected activity and, thus, protected from retaliation pursuant to the anti-retaliation statutes of the FLSA and NYLL.

3.      Among other protected activity, Plaintiff made sufficiently clear and specific complaints to Cantor, through her supervisors and senior-level executives at Cantor concerning Cantor's systematic violations of FLSA and NYLL, including, but not limited to, in respect of its inability and unwillingness to properly classify its employees as exempt or non-exempt under the FLSA and NYLL.

4.      For years, Cantor has effectively operated a system whereby it has successfully restricted qualified non-exempt employees from receiving overtime wages under FLSA. Plaintiff, a human resources professional at Cantor, not only recognized these injustices, but also complained about them to Cantor and sought to rectify them.

5.       In the time before Cantor's affiliate, BGC Partners, Inc. ("*BGC*"), acquired GFInet, Inc. ("*GFI*"), Plaintiff was a loyal and competent human resources professional tasked with managing the human resources function, which encompassed managing payroll, compensation, employee relations, benefits, talent acquisition, performance management, training, and development, for the GFI Americas region.

6.      During this time, Cantor's human resources management inquired into Plaintiff's experience with FLSA matters, and sought out her expertise.

2

7.      As part of her duties and responsibilities, and in response to various employee inquiries, including, but not limited to a lawsuit filed in this Court by a Cantor employee concerning FLSA and NYLL violations, Plaintiff investigated Cantor's FLSA and NYLL classification methods and practices.  During Plaintiff's investigation, it became increasingly clear that Cantor had been misclassifying its employees in order to avoid the necessity of paying its employees overtime.

8.      In turn, Plaintiff began vocalizing her opposition to Cantor's decision to misclassify its employees in order to prevent them from receiving overtime wages.

9.      These complaints were sufficiently clear and detailed for a reasonable employer to understand them, in light of both content and context, as an assertion of rights protected by FLSA and NYLL and a call for their protection, as required for protection from retaliation under FLSA and NYLL.

10.     As more specifically set forth herein, in retaliation for her complaints concerning Cantor's FLSA and NYLL violations, Cantor deliberately and schematically retaliated against Plaintiff, resulting in termination of her employment.

11.     Plaintiff seeks compensatory, liquidated, and punitive damages, the benefits she was denied, injunctive and declaratory relief, and appropriate legal and equitable relief, including liquidated damages and attorneys' fees.

## JURISDICTION AND VENUE

12.     This Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because this case is brought under the FLSA, 29 U.S.C. §§ 201, et seq. (and its anti-retaliation statutes, 29 U.S.C. § 215).

13.     This court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C.

3

§ 1367(a), because the state law claims arise from a common nucleus of operative facts with the federal claims and are so related to Plaintiff's federal claims that they form a part of the same case or controversy between the parties under Article III of the United States Constitution.

14.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)-(c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Southern District of New York.

## PARTIES

15.     Plaintiff, Karen Aflalo, resides at 8 Elm Street, Great Neck, New York 11021. She is a citizen of the United States.

16.     Aflalo was employed by GFInet, wholly owned subsidiary of GFI, from March 25, 2002 until GFI was acquired by BGC in February 2015, at which time Aflalo became an employee of Cantor, where she remained employed until her retaliatory termination meeting, which took place on March 17, 2016.

17.     Upon information and belief, Cantor Fitzgerald, L.P. is a limited partnership doing business within New York County in the State of New York and maintains corporate headquarters within New York City at 499 Park Avenue, New York, New York 10022.

18.     Upon information and belief, Cantor Fitzgerald, L.P. is the ultimate parent of the Cantor entities.

19.     Upon information and belief, Cantor Fitzgerald Securities, Inc. is a corporation organized and existing under the Laws of New York, with principal offices at 110 E. 59th Street, New York, New York 10022 and is an investment bank and brokerage business.

20.     The address of Cantor Fitzgerald Securities at 110 East 59th Street, New York, New York is connected to the address of Cantor Fitzgerald, L.P. at 499 Park Avenue, New York,

New York 10022.

21.     Upon information and belief, Cantor Fitzgerald, L.P. holds an ownership interest in Cantor Fitzgerald Securities.

22.     Upon information and belief, BGC Partners, Inc. is an affiliate of Cantor Fitzgerald, L.P. and is owned, managed and/or controlled, at least in part, by Cantor Fitzgerald, L.P.

23.     Upon information and belief, BGC Partners, Inc. is a publicly traded corporation, organized and existing under the laws of New York, and maintains corporate headquarters at 499 Park Avenue, New York, New York 10022.

24.     Upon information and belief, Cantor (i.e., all of the defendants collectively) maintains control, oversight, and direction over the operation of each other's facilities, including its employment practices.

25.     During all relevant times, Cantor, together with all Defendants, was Plaintiff's employer within the meaning of all applicable statutes.

## FACTS

### AFLALO'S EMPLOYMENT BACKGROUND

26.     In February 2015, Defendant BGC announced its acquisition of GFI Group, Inc. ("*GFI*"), where Aflalo had competently served as Human Resources Director of the Americas for more than a decade (*i.e.*, since March 2002).

27.     During her tenure at GFI, Aflalo was a trusted, well respected, senior human resources employee responsible for managing, developing, and administering strategies for employee relations, talent acquisition, performance management, HR compliance, payroll, compensation, and benefits supporting all back and front office staff in the Americas region.

28.     Shortly following Cantor's announcement of its acquisition of GFI in February 2015, Stephen Merkel ("*Merkel*"), Cantor's General Counsel, visited Aflalo's office to welcome her to the "Cantor Family of Companies."  Merkel and Aflalo had worked closely together when Aflalo worked at Cantor Fitzgerald LP from 1993 until 1998.

29.     During that meeting, Merkel explained to Aflalo that she would be working closely with Lori Pennay ("*Pennay*"), Cantor's Global Head of Human Resources, to ensure a smooth transition and to perform human resources functions for all Cantor entities.

30.     Shortly after Aflalo began working with Pennay, Pennay confided to Aflalo that she was looking forward to working with Aflalo based upon all the great things Merkel reported to her from his days of working with Aflalo at Cantor.

31.     Over the next couple of months, Aflalo worked closely with Pennay.  During this time, Aflalo's responsibilities far exceeded her title as Pennay relied heavily on Aflalo to serve in a global capacity working with other GFI Human Resources Directors in the EMEA (*i.e.*, Europe, Middle East, and Africa) and Asia Regions in order to streamline (and coordinate and supply) countless global headcount reports, global payroll reports, and information on GFI's global benefits and policies.

32.     Aflalo also worked closely with Patricia Dreste ("*Patty*" or "*Dreste*") in preparing various policy and benefits changes for GFI employees.

33.     Indeed, Cantor implemented and approved many of Aflalo's benefit contribution strategy recommendations for GFI employees.

34.     In sum, Aflalo's contributions and accomplishments from the moment she joined Cantor had established her as an invaluable human resources employee whose advice and guidance was sought out and utilized by her supervisors.

35.     For instance, beginning in or around March 2015, Aflalo began working very closely with Dan Aiken ("*Aiken*"), Vice President, Human Resources Generalist at Cantor and a Cantor Human Resources Business Partner who supported Accounting, Finance, and Operations.

36.     Aflalo's main focus in working with Aiken was to integrate the GFI Accounts Payable, Accounts Receivable, Accounting, and Middle/Back Office Operations staff into Cantor's teams and business.

### AFLALO IDENTIFIES AND LODGES PROTECTED COMPLAINTS OF LABOR LAW VIOLATIONS

37.     On or around July 6, 2015, Steven Puente ("*Puente*"), a technical support employee at Cantor who worked on Cantor's "Helpdesk," filed a class action lawsuit against Cantor Fitzgerald alleging Federal (FLSA) and State (NYLL) Labor Law violations. Specifically, in the matter captioned, Puente v. Cantor Fitzgerald Securities, 1:15-cv-05196, employees of Cantor made claim that, *inter alia*, Cantor maintained an unlawful pattern or practice of misclassifying its employees, resulting in unpaid earned overtime wages (the "*FLSA Action*").

38.     Puente's complaint alleged that, between 2008 and 2014, his supervisors at Cantor acknowledged that he and other technical support employees had been misclassified as exempt from overtime, failing to pay them their statutorily required one and one half times (1.5x) their regular rate of pay for all hours worked in excess of 40 hours.

39.     In fact, months before Puente officially filed the FLSA Action, during a telephone conversation, Pennay asked Aflalo how GFI had classified "Helpdesk" employees (*i.e.,* exempt or non-exempt).

40.     During that call, Aflalo told Pennay that, originally, when Aflalo arrived at GFI, "Helpdesk" employees at GFI were *misclassified* as exempt employees; but that, following an

FLSA audit that was completed in conjunction with the guidance of the law firm Epstein, Becker & Green, "Helpdesk" employees were properly re-classified as non-exempt.  At the conclusion of their conversation, Pennay told Aflalo that she was in the midst of interviewing firms to assist with such an audit and that she would be relying on Aflalo's expertise in reviewing FLSA compliance.  This never happened.

41.     The FLSA Action also alleged that Cantor, among other things, (i) tried to force certain misclassified employees into signing away their rights to overtime; (ii) acted irresponsibly in failing to post and keep FLSA and NYLL overtime provisions; and (iii) failed to act in accordance with record-keeping requirements.

42.     The Complaint details how Cantor admitted that it misclassified Puente (and others) and attempted to induce Puente into waiving his full entitlement to his overtime wages by executing a settlement agreement for *half* of the $100,000 he was owed, which Dreste asked him to sign.

43.     Consequently, Puente refused Dreste's offer made on behalf of Cantor because it failed to include all of the earned, unpaid overtime during the period Cantor misclassified him as exempt.

44.     Thus, amazingly, instead of proactively remedying its labor law deficiencies and properly paying out accrued overtime wages to misclassified employees, Cantor made an economic decision, *a la Ford Pinto style*, to capitalize on its unequal bargaining power over its lower level employees by pressuring them into signing unlawful and unenforceable waivers of their rights to hard-earned overtime wages.

45.     Instead of owning up to its errors, rectifying its mistakes and cleaning up its act, Cantor's strategy is to terminate employees who have either rightfully earned overtime or who

voice complaints about Cantor's FLSA classifications, all the while sidestepping the need to correct its broken system.

**COMPLAINTS REGARDING CANTOR'S FLSA MISCLASSIFICATIONS**

46.     Shortly after the filing of the FLSA Action, Aflalo reviewed other classes of employees at Cantor to determine whether Cantor was misclassifying any other category of employee.

47.     Besides the discussions Aflalo had already had with Pennay concerning "Helpdesk" employees, Aflalo, in connection with her work with Aiken, had also begun investigating the manner in which Cantor was classifying different employees in the Operations/Accounting department, which is why she was not surprised by the filing of the FLSA Action.

48.     Specifically, Aflalo discovered that Cantor was not properly classifying "Accounts Payable," "Accounts Receivable," and "Junior Accountants."

49.     When Aflalo began to identify these serious misclassification matters to Aiken, Aiken's response was repeatedly dismissive.

50.     While Aiken deflected and told Aflalo that he would **"bring it up to Patty [Dreste],"** he confided that he **"did not think that anything would change, as that's the way they have always been paid."**   Indeed, Aiken's and Dreste's responses to Aflalo's concerns are consistent with the allegations specified by Puente in the FLSA Action.

51.     Aflalo did not limit her conversation with Pennay to reporting labor law violations (that are protected under Federal and State labor laws), but Aflalo also offered solutions.

52.     Aflalo reconfirmed to Pennay that she had vast experience reviewing the employment duties of all staff at GFI, which included conducting wage and hour audits

alongside experienced employment attorneys.  She went on to explain to Pennay the process by which she investigated FLSA and NYLL compliance and the steps she took to remediate any of GFI's unlawful practices.

53.     Aflalo told Pennay that, while at GFI, she had investigated GFI's classification of other employee classes (*i.e.,* other than the "Helpdesk" employees) and had observed that there were several employees whose employment status was misclassified.   Aflalo explained to Pennay that, in order to remediate GFI's unlawful classification, Aflalo had worked with GFI's legal department to hire outside FLSA experts from the law firm Epstein, Becker & Green to assist her with her investigation.  Aflalo also explained to Pennay the various benefits of having lawyers conduct interviews with managers in order to review the various roles and tasks of each of their employees.

54.     Aflalo also told Pennay that, in addition to overseeing and managing a "self" audit by outside counsel, Aflalo also managed a second internal FLSA "self" audit conducted after GFI had acquired Amerex Brokers LLC.

55.     Pennay expressed her apparent relief that Aflalo clearly had extensive experience with FLSA legal and compliance matters, and confided to Aflalo that she had been mandated directly by Howard Lutnick, Cantor Fitzgerald's CEO, who told her: **"I don't care how you do it, just clean up the mess right away."**

56.     Pennay told Aflalo that she intended to rely upon her to conduct similar investigations at Cantor in the wake of the FLSA Action to help determine, inter alia, which classifications of employees would be *exempt* and which would be *non-exempt* from mandatory overtime.

57.     Pennay thereafter reported to Aflalo that she was in the midst of interviewing

various law firms and that once she had hired a specific firm, she would get Aflalo involved to work with them on the FLSA issues of remediating misclassified groups of employees.

### AFLALO SUFFERS RETALIATION FOR HER CONTINUED PROTECTED ACTIVITY

58.     Despite her conversations with Pennay, and despite the purported mandate for Aflalo to identify labor law violations and assist in remedying Cantor's unlawful misclassifications, Aflalo experienced resistance, opposition, and, worst of all, retaliation from Cantor brass for her protected activity.

59.     For example, in early October 2015, Aflalo had a conversation with Aiken about Miriam Fabisiak ("*Fabisiak*"), a Junior GFI Accountant that was being paid on an hourly basis (as opposed to salary).   Aiken told Aflalo that Fabisiak's boss, who is also Cantor's Finance Manager, was becoming **"angry about all of [Fabisiak's submitted] overtime."** Aiken sternly told Aflalo that they were going to change Fabisiak's classification from *non-exempt* to *exempt* and that he was going to prepare a new offer letter for her to sign **"to make it all legit."**

60.     Aflalo expressed to Aiken that, based on the work Fabisiak was conducting as a Junior Accountant for GFI, she had been properly classified as a *non-exempt* employee.   Aflalo then told Aiken that he should be discussing the matter with Pennay and Dreste before making any changes.   Aiken was again dismissive and stated that he would **"reach out to Patty [Dreste],"** but that he was **"confident"** that Dreste would agree with him on classifying Fabisiak as exempt.

61.     In mid-October 2015, when Pennay called Aflalo about another matter, Aflalo raised with Pennay the concerns she discussed with Aiken.   To appease Aflalo, Pennay assured Aflalo that she would look into the matter.

62.     Aflalo never heard back from Pennay.  Upon information and belief, Pennay never looked into the matter.

### AFLALO'S ELEVATED CONCERN WITH FLSA MISCLASSFICATIONS

63.     In the months following the FLSA Action, it slowly became clear to Aflalo that her mandate to investigate, report and remedy Cantor's labor law violations was for cosmetic purposes only so that Cantor could report to the financial Wall Street public that they were making efforts to remedy any misclassifications of employees in the wake of the FLSA Action. However, Cantor's actions in response to Aflalo's reports, complaints, findings, and recommendations confirm that Cantor had no intention whatsoever of changing their ways.

64.     By February 2016, despite Aflalo's continued objections to Cantor's refusal to properly classify employees (as exempt or non-exempt), Cantor's derogation of FLSA compliance was snowballing into a significant problem.

65.     Specifically, rather than expend the significant time costs associated with properly classifying employees, Cantor would simply terminate those employees that caused, or could cause, any FLSA problems.

66.     In or around February 2016, things went from bad to worse.  At that time, Aflalo was directed by Dreste to terminate two long-term GFI Operations employees, Sujit Chakravarty ("*Chakravarty*") and Kevin Mullen ("*Mullen*"), because **"they submitted too much overtime."**

67.     In an effort to disguise their FLSA classification problem, Dreste instructed Aflalo to inform Chakravarty and Mullen that their employment was terminated as part as a Reduction in Force ("*RIF*").

68.     Prior to the termination of Chakravarty and Mullen, Aflalo met with their

managers, Art Vogel ("*Vogel*") and Jim Demarinis ("*Demarinis*").  During that meeting, both Vogel and Demarinis each confessed to Aflalo that they were surprised that either Chakravarty or Mullen were receiving overtime, as none of Cantor's Operations employees were overtime eligible.

69.    Aflalo objected, informing both Vogel and Demarinis that, during her time at GFI, employees similarly situated to those Aflalo had investigated were *always* paid overtime; and that specialized wage and hour audits confirmed that such employees *should be* classified as non-exempt.

70.    Despite Aflalo's assessments and objections, Cantor terminated the employment of Chakravarty and Mullen under false pretenses rather than maintaining their correct classification as non-exempt employees eligible for earning overtime.

71.    As proof that the excuse of "Reduction in Force" is mere pretext to retaliation, Cantor's Operations Managers were interviewing Chakravarty's and Mullen's replacements the day immediately following their terminations.

72.    Disgusted by this latest incident of terminating employees that are otherwise correctly classified as non-exempt and overtime eligible, Aflalo once again contacted Aiken to discuss the FLSA classifications of Operations staff and her growing concerns that these (and other) employees were purposely not being classified properly.  By demanding that Aflalo terminate these two Operations employees under false pretenses, Aflalo felt that she was forced into being complicit in Cantor's pretextual cover-up.

73.    Dismissively, Aiken responded, **"This is the way it has always been done at Cantor,"** and that **"Ops people have never been paid overtime."**

74.    Aflalo's insistence that her complaints concerning misclassification of employees

and the significant labor law compliance issues and violations be brought to the attention of senior-level executives, including Pennay and Dreste, fell on deaf ears.  Indeed, Cantor had learned nothing from the FLSA Action.

AFLALO'S RETALIATORY TERMINATION

75.    By the end of February 2016, it became crystal clear why Cantor so aggressively sought to terminate Chakravarty and Mullen under the guise of a RIF in retaliation for their submission of overtime.

76.    On February 29, 2016, the Southern District of New York approved a final settlement of the FLSA Action, which had been submitted for the Court's approval weeks earlier.

77.    With the FLSA Action behind them, Cantor no longer was concerned that Aflalo's issues or complaints of continuing labor law violations would disturb resolution of the FLSA Action.

78.    Immediately following settlement of the FLSA Action, Aflalo began experiencing retaliation in the terms, conditions, and privileges of her employment in direct retaliation for her complaints concerning FLSA and NYLL violations.

79.    In the months leading up to Cantor's settlement of the FLSA Action, Aflalo consistently expressed and voiced her concerns to multiple supervisors in human resources as well as co-workers at Cantor concerning Cantor's labor law violations and its deliberate and willful refusal to remedy past, present, and future violations.

80.    Aflalo was very clear to her supervisors about the process by which she had resolved the classification issues at GFI 10 years prior, which she urged Cantor to adopt or heed. In doing so, Aflalo made clear that she was concerned with Accounts Payable, Accounts Receivable, Junior Accountants, and Middle/Back Office Operations staff and, specifically, that

they were not being classified correctly as non-exempt employees.

81.     Aflalo also vocalized the magnitude and urgency of Cantor's labor law violations to Aiken, who repeatedly ignored Aflalo's complaints.

82.     Aflalo realized that the labor law violations she was reporting were substantial, as she witnessed long-term GFI Operations employees being terminated for putting in too much overtime.

83.     Characteristically, each time Aflalo raised concerns to Aiken about these matters, Aiken decided against addressing them with management.

84.     Cantor evaded these classification issues with respect to Cantor employees, and projected a façade that terminations of GFI employees were occurring as part of a "RIF," or "cost cutting" measures, rather than properly classifying Cantor employees as non-exempt and eligible to be paid overtime wages.

85.     Instead of acting to resolve a systematic problem, Cantor terminated employees who either earned too much overtime or vocally opposed the misclassification issues that were consistently ignored by management.

86.     Despite Aflalo's knowledge about FLSA matters, her expertise and experience in conducting wage and hour audits, and her legitimate concern to remedy Cantor's classification system, Cantor opted to retaliate against Aflalo for sufficiently, clearly, verbally, and formally expressing and detailing her concerns to, and notifying, her supervisors, who understood that Aflalo was making complaints of FLSA and NYLL violations and that she was protected from retaliation for doing so.

87.     The first apparent act of retaliation was on March 15, 2016, when bonuses were paid to back office personnel.

15

88.     Despite specific promises of a bonus [WHAT PROMISES?], the accrual of such bonus, the earning of a bonus, and satisfying all conditions to receiving such bonus, Aflalo did not receive a 2015 bonus.

89.     Shortly thereafter, on March 17, 2016, much to Aflalo's disbelief, under the guise of conducting annual performance and bonus reviews, Dreste and Pennay visited Aflalo in her office.  During this visit, Dreste and Pennay informed Aflalo that they were receiving pressure to cut costs in the human resources budget, and as a result, were **"eliminating [her] role."**

90.     During the meeting, Pennay confirmed to Aflalo that she would be receiving her 2015 bonus of $50,000 – the same amount she received the prior year.

91.     Dreste and Pennay then instructed Aflalo that, over the course of the next three months, she was to transition her work to Dyanne Rosado ("*Rosado*"), who would be taking over her responsibilities.

92.     Aflalo was a loyal employee at GFI and then Cantor for over 14 years.  Not coincidentally, Aflalo's termination from Cantor was temporally and proximately connected with not only her questioning and complaining about FLSA matters with her supervisors and co-workers, but also Cantor's settlement of the FLSA Action.

### CANTOR'S ALLEGED COST-CUTTING MEASURE WAS PRETEXTUAL

93.     Cantor's termination of Aflalo's employment was a pretext artfully disguised as a cost-cutting measure.

94.     Just a few days after Aflalo's termination, Rosado started to take over Aflalo's responsibilities, and Cantor promoted Rosado from Vice President to Senior Vice President of Human Resources.

95.     Upon information and belief, Rosado's promotion not only entailed a change in

title and responsibility, but also a salary increase.

96.     It was not long before Rosado admitted to Pennay and Dreste that she could not handle the added responsibilities of on-campus recruiting, a task that Aflalo dutifully performed as a Human Resources Director.

97.     As a result, Pennay and Dreste were forced to hire a recruiter to focus solely on on-campus recruiting, a staff position that was unnecessary when Aflalo was employed by Cantor.

98.     Seemingly, Cantor's decision to promote Rosado only increased spending and decreased efficiencies within the human resources department, a cost Cantor could have easily avoided had it continued to employ Aflalo.

99.     Among other indications of Cantor's pretext is Dreste's and Pennay's avoiding proper channels in their decision to terminate Aflalo's employment.

100.    For instance, after not receiving a bonus on March 15th and upon learning of her March 17th "performance review meeting" by Dreste and Pennay, Aflalo contacted Richard Giles ("*Giles*"), Head of GFI's Americas Brokerage, and Prash Naik ("*Naik*"), GFI's Global Chief Operating Officer, to discuss possible scenarios concerning her employment.

101.    Both Giles and Naik assured Aflalo that they were unaware of any issues regarding Aflalo's employment - performance or otherwise - and that **"they [Dreste and Pennay] would never do anything to you without discussing it with us first."**

102.    Indeed, Giles and Naik learned of Aflalo's termination only after it was done.

103.    Aflalo was directed by Dreste to vacate Cantor's offices as of April 15, 2016, though Aflalo willingly cooperated with any transition until June 17, 2016.

104.    Due to Aflalo's strong and proven performance as a human resources

professional, Cantor could not attribute Aflalo's termination to her incompetence.

105.    In addition, Cantor did not formally designate their termination of Aflalo's employment as a RIF, as she did not receive any of the legally required paperwork.

106.    Rather, Cantor disguised their decision to terminate Aflalo's employment as a cost-cutting scheme as a way to silence Aflalo's vocal concern for Cantor's misclassification of its employees as exempt from overtime wages and its avoidance in correcting its systemic FLSA issues.

107.    Aflalo therefore brings this action to seek redress of Cantor's violations of law, which has caused her to suffer damages.

108.    As a remedy, Aflalo seeks compensatory damages, the benefits she was denied, and lost wages, plus attorney's fees, interest and costs, and any statutory remedies and/or relief available to her.

## CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiff maintains the following legal claims, jointly and severally, against Defendants:

## COUNT ONE
### (RETALIATION UNDER THE FLSA)

109.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

110.    At all relevant times herein, Plaintiff was an employee entitled to the protections provided by the applicable anti-relation provisions, without qualification, including those protections provided for under §215(a)(3).

111.    Plaintiff was engaged in a protected activity by making oral complaints to her employer (including, but not limited to, her supervisors) concerning Cantor's multiple violations

of the FLSA.

112.    Each of Plaintiff's complaints is sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.

113.    Accordingly, Plaintiff's complaints of FLSA violations to Cantor constitute protected activity that is protected by the FLSA anti-retaliation provisions.

114.    In violation of FLSA's anti-retaliation statutes, Cantor retaliated against Plaintiff for her protected activity by, among other actions, terminating her employment and depriving her of other monetary entitlements.

115.    Cantor's termination of Plaintiff's employment constitutes an adverse employment action.

116.    Plaintiff's engagement in a protected activity was a proximate cause or motivating reason for Cantor's adverse action against Plaintiff.

117.    Cantor violated the anti-retaliation provisions by terminating Plaintiff for exercising her protected rights under §215(a) of the FLSA.

118.    As a result of Cantor's conduct, Plaintiff has suffered substantial damages and is entitled to relief in the form of compensatory damages, lost wages, plus attorneys' fees, interest and costs and any other statutory relief available to her, including emotional pain and suffering and punitive damages, if applicable.

## COUNT TWO
### (NEW YORK LABOR LAW § 215 - RETALIATION)

119.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

120.    At all relevant times herein, Plaintiff was an employee entitled to the protections

provided by the applicable anti-relation provisions, without qualification, including those protections provided for under NYLL.

121.   Plaintiff was engaged in a protected activity by making oral complaints to her employer (including, but not limited to, her supervisors) concerning Cantor's multiple violations of the NYLL.

122.   Each of Plaintiff's complaints is sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.

123.   Accordingly, Plaintiff's complaints of NYLL violations to Cantor constitute protected activity that is protected by the NYLL anti-retaliation provisions.

124.   In violation of NYLL's anti-retaliation statutes, Cantor retaliated against Plaintiff for her protected activity by, among other actions, terminating her employment and depriving her of other monetary entitlements.

125.   Cantor's termination of Plaintiff's employment constitutes an adverse employment action.

126.   Plaintiff's engagement in a protected activity was a proximate cause or motivating reason for Cantor's adverse action against Plaintiff.

127.   Cantor violated the anti-retaliation provisions by terminating Plaintiff for exercising her protected rights under the NYLL.

128.   As a result of Cantor's conduct, Plaintiff has suffered substantial damages and is entitled to relief in the form of compensatory damages, lost wages, plus attorneys' fees, interest and costs and any other statutory relief available to her, including emotional pain and suffering and punitive damages, if applicable.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court order the following relief in favor of

Plaintiff:

I.     A Declaratory Judgment declaring that the acts complained of herein violate the rights of Plaintiff as guaranteed under applicable Federal & State Law;

II.    A judgment granting equitable relief directing Defendants to cease and desist from exposing Plaintiff to retaliation;

III.   A judgment directing Defendants to reimburse and make Plaintiff whole for any and all earnings, including bonus payments, she would have received but for Defendants' discriminatory treatment and unlawful dismissal, including but not limited to, back pay, contractual damages and benefits;

IV.    A judgment awarding Plaintiff compensatory damages for mental anguish, loss of dignity, humiliation, and injury to livelihood in an amount that is fair, just, and reasonable, to be determined at trial, including reasonable attorneys' fees, as provided under applicable law.

V.     A judgment awarding Plaintiff statutory damages for Defendants' intentional retaliation of Plaintiff;

VI.    A judgment awarding Plaintiff front pay;

VII.   A judgment awarding Plaintiff punitive damages;

VIII.  An award of prejudgment interest, costs and attorney's fees; and

IX.    Such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable by jury in this action.

Dated: New York, New York
       December 5, 2016

Respectfully submitted,

**SACK & SACK, LLP**

/s/ Jonathan Sack

By:  _____

Jonathan Sack, Esq.

**Attorneys for Plaintiff**
**KAREN AFLALO**
70 East 55th Street, 10th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702